UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUFUS SPEARMAN #320836,

        Plaintiff,                          Hon. Ellen S. Carmody

v.                                        Case No. 1:18-cv-463

STATE OF MICHIGAN, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants' Motion for Summary Judgment</u>. (ECF No. 47).   Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted** and this matter **terminated**.

## BACKGROUND

This factual background is adopted from the May 22, 2018 screening opinion issued by the Honorable Janet T. Neff.  (ECF No. 41).  Plaintiff is suing the State of Michigan, the MDOC, MDOC Correctional Facilities Administration (CFA) Deputy Director Thomas Finco, MDOC CFA Special Activities Coordinator David M. Leach, Unknown Parties (identified as the members of the Chaplaincy Advisory Council[1]), Carson City Correctional Facility (DRF) Warden Cathleen Stoddard, Marquette Branch Prison (MBP) Warden Robert Napel, Chippewa Correctional Facility (URF) Warden Jeffrey Woods, Alger Correctional Facility (LMF) Warden

---

[1] According to MDOC Policy Directive 05.03.150 (eff. 9/15/2015): "A Chaplaincy Advisory Council (CAC) comprised of representatives of various faiths and denominations, serves in an advisory capacity to the Department regarding religious policy and programming. The CFA Special Activities Coordinator shall be a member of the CAC and ensure that all major religions are represented. Organization and membership of the CAC is governed by its constitution and bylaws. The CAC constitution and bylaws shall not conflict with any Department policy or procedure and are subject to the approval of the Deputy Director."

Catherine S. Bauman, and Baraga Correctional Facility (AMF) Warden Shane Place.   Plaintiff is suing these Defendants for their role in failing to recognize his religion—the Science of Nuwaubu—and for burdening his exercise of that religion.   Specifically, Plaintiff claims that Defendants have: (1) refused to recognize the Science of Nuwaubu religion and thereby denied Nuwaubians the benefits and privileges afforded to other religious groups; (2) denied Plaintiff a religious diet; (3) denied Plaintiff primary religious literature; (4)   and refused to permit Plaintiff to participate in the Ramadan fast.   (Am. Compl., ECF No. 12, PageID.47.)

Plaintiff's amended complaint tracks his efforts to exercise his religion beginning in June of 2013 while he was incarcerated at LMF.   On June 19, 2013, he wrote LMF Chaplain J. Kent requesting institutional purchase of Nuwaubu primary religious materials through the Prisoner Benefit Fund (PBF).   (*Id.*, PageID.51.)   On June 20, 2013, Chaplain Kent responded, informing Plaintiff that only religious groups recognized by the MDOC and authorized to conduct group religious services were entitled to PBF funding.   (June 20, 2013 Memo., ECF No. 12, PageID.131.)   Chaplain Kent's response to Plaintiff's request was entirely consistent with the relevant MDOC policy directives.

MDOC Policy Directive 05.03.150 spells out the benefits of religious group recognition:

> The Department recognizes religious groups for the purpose of identifying those groups authorized to conduct group religious services and attend group religious activities and for identifying authorized personal religious property prisoners belonging to the religious group may possess . . . . Attachment A identifies those religious groups recognized by the Department that are authorized to conduct group religious services and attend group religious activities as well as all authorized personal religious property members of that religious group may possess. Attachment B identifies those religious groups recognized by the Department that

are not authorized to conduct group religious services or attend group religious services but whose members are authorized to possess personal religious property. Prisoners are allowed to possess personal religious reading material of any religion as set forth in Paragraph II.

MDOC Policy Directive 05.03.150 (eff. 9/15/2015) ¶ I.[2]

The Nuwaubu religion is not recognized by the MDOC.   The MDOC has set up

the following process to recognize religions:

A prisoner or group of prisoners belonging to a religious group not recognized by the Department may request Department recognition of that group by submitting a written request to the Warden or designee. The request shall include information regarding the group's religious beliefs and practices. The Warden shall ensure all requests and supporting documents are referred to the CFA Special Activities Coordinator for review through the appropriate chain of command. The CFA Special Activities Coordinator shall present the material to the CAC for additional review, if needed. The CFA Special Activities Coordinator shall forward his/her recommendation, and that of the CAC if applicable, to the Deputy Director for a final determination.

The Deputy Director shall make the final decision as to whether a religious group will be granted Department recognition, and if so, whether group religious services and activities and personal religious property will be allowed. The group shall be granted recognition if it is determined to be a bona fide religious group with beliefs and practices not adequately represented by an existing recognized religious group, based on any recommendation received from the CAC. The decision whether to allow the group to conduct group religious services and activities, and whether to allow personal religious property, shall be based on whether the practice of the religion or possession of the property item would pose a custody and security threat. The decision whether to allow the group to conduct group religious services and activities also shall be based on the number of prisoners identified as belonging to the religious

---

[2] Recognition also makes a religious group eligible for office supplies and materials paid for by the Prisoner Benefit Fund if authorized by the PBF Committee.   MDOC Policy Directive 04.02.110 (eff. 11/1/2017) ¶ E.1.

group. All Assistant Deputy Directors (ADD) and Wardens shall be
advised of the final decision.

*Id.*, ¶¶ K, L.

With regard to reading material the directive further provides: "Prisoners are allowed to receive religious reading material through the mail and from the institutional Chaplain. . . includ[ing] reading materials about a religious group not granted recognition by the Department."   *Id.*, ¶ HH.   With regard to religious diets, the policy directive provides:

The Department offers a vegan menu to meet the religious dietary needs of prisoners . . . . The Vegan menu shall comply with Kosher and Halal religious tenets. A prisoner who believes the Vegan menu does not meet his/her religious dietary needs may request an alternative menu. An alternative menu will be developed and provided only with approval of the Deputy Director and only if it is determined that the Vegan menu does not meet the religious dietary needs of the prisoner. All religious menus shall meet the minimum nutritional standards set forth in PD 04.07.100 "Offender Meals."

A prisoner may eat from a Vegan menu only with approval of the CFA Special Activities Coordinator. Approval shall be granted only if it is necessary to the practice of the prisoner's designated religion, including the prisoner's sincerely held religious beliefs. To request approval, the prisoner must submit a written request to the Warden or designee, who shall obtain information regarding the prisoner's request and religious beliefs prior to referring the request to the CFA Special Activities Coordinator. The CFA Special Activities Coordinator shall notify the Warden or designee of the decision. The Warden shall ensure that the prisoner is notified. A prisoner whose request is denied shall not be allowed to submit another request to eat from that religious menu for at least one year.

\*       \*       \*

[P]risoners shall be permitted to observe religious fasts and feasts that are necessary to the practice of their religion, as approved by the CFA Special Activities Coordinator and set forth in the Handbook of Religious Groups. A prisoner or group of prisoners who wants to observe a religious fast or feast that has not already been approved by the CFA Special Activities Coordinator must

submit a written request to do so to the Warden or designee, which shall include information regarding the religion's beliefs and practices. The Warden or designee shall refer the request and supporting documents to the CFA Special Activities Coordinator through the appropriate chain of command for approval. The CFA Special Activities Coordinator shall present the material to the CAC for additional review, if needed. Approval shall be granted only if the fast or feast is necessary to the practice of a bona fide religion and observance of the fast or feast would not pose a threat to the order and security of the facility. The CFA Special Activities Coordinator shall ensure ADDs and Wardens are notified of newly approved religious fasts or feasts.

*Id*., ¶¶ OO, PP, WW.

Several months later, while Plaintiff was incarcerated at DRF, he raised the issue with Chaplain Susan Cleveland.   He asked her to help him acquire religious reading materials and to authorize religious meals.[3]   Chaplain Cleveland commenced the process; however, based on her internet research[4], informed Plaintiff that his request would likely be denied.   During May of 2014, Chaplain Cleveland informed Plaintiff that his requests had, as Chaplain Cleveland predicted, been denied by the CFA.

Plaintiff then raised the issues, "an alternative vegan menu . . . and Department recognition of the Nuwaubu religion ,"directly with CFA Deputy Director Finco.  (5/26/2014 Corr., ECF No. 12, PageID.137-143.)   CFA Special Activities Coordinator Leach responded to the letter directing Plaintiff to follow the procedure specified in the policy directive.  (6/11/2014

---

[3] It is difficult to determine the precise nature of Plaintiff's religious meal request.   In some instances it appears he is seeking approval to eat the vegan diet for religious reasons.   In other instances it appears he is seeking an alternative to the normal vegan diet for religious reasons.

[4] The Nuwaubian religion does not appear to have many adherents.   Its founder and leader Dwight York is serving a sentence of 135 years in the custody of the Federal Bureau of Prisons for federal crimes including racketeering and Mann Act violations where the unlawful sexual activity was child molestation.   *See, e.g., United States v. York*, No. 5:02-cr-27 (M.D. Ga.) (Am. Mot. to Vacate, Doc. 384).

Corr., ECF No. 12, PageID.145.)   Accordingly, Plaintiff returned to Chaplain Cleveland.[5]

Chaplain Cleveland again interviewed Plaintiff.   She considered his request first as if he were asking for an alternative to the vegan menu.   Based on Plaintiff's statements and her research into the dietary requirements of the Nuwaubu religion, Chaplain Cleveland concluded that Plaintiff was not entitled to an alternative to the vegan menu because the vegan menu appeared to satisfy the requirements of Plaintiff's religion.   (7/7/2014 Mem., ECF No. 12, PageID.147-148.)   Chaplain Cleveland then considered Plaintiff's request as if he were simply asking for the vegan menu.   She concluded that he had already asked for that religious accommodation and that CFA had denied his request.   (*Id.*)   By policy directive, therefore, Plaintiff was not permitted to ask again until May 5, 2015.   (*Id.*)   Chaplain Cleveland's analysis was merely a recommendation.

Plaintiff   wrote   Warden   Stoddard   challenging   Chaplain   Cleveland's recommendation.   It does not appear that Plaintiff waited for a response, because he also wrote to CFA Deputy Director Finco asking for recognition of the Nuwaubu religion.   CFA Special Activities Coordinator Leach responded that Plaintiff should direct the request to the warden first.   (8/20/2014 Resp. to Prisoner Corres., ECF No. 12, PageID.160.)   Plaintiff alleges that he wanted recognition for the Nuwaubu religion; however, he did not request group religious services

---

[5]  During June and July of 2014, Plaintiff also sought another religious diet accommodation.   He asked to participate in the Ramadan fast.   *See* (Prisoner Grievances, ECF No. 12, PageID.77-83.)   Plaintiff indicates that Nuwaubians follow and observe the Muslim practice of the Ramadan fast.   (*Id.*, PageID.82.)   Plaintiff was not permitted to participate in the fast based on the CFA Special Activities Coordinator's May 7, 2014, memo limiting eligibility to participate in the Ramadan fast to "'prisoners . . . whose religious designation . . . is Muslim, Moorish Science Temple of America, or the Nation of Islam.'"   (*Id.*, PageID.79.)   Although Plaintiff grieved the denial of the Ramadan fast, it does not appear he submitted a written request to participate after he was informed that he was not approved per the May 7, 2014 memo.   MDOC Policy Directive 05.03.150 (Eff. 9/15/2015) ¶ WW.   Plaintiff renewed his request to participate in the Ramadan fast two years later after he had been transferred to AMF. (Prisoner Grievances, ECF No. 12, PageID.104-106.)   Once again, however, it appears that Plaintiff raised the issue only with the chaplain and, after he was informed that he was not eligible, he did not thereafter seek approval by submitting a request to the warden.   5/18/2016 Mem., ECF No. 12-1, PageID.205.)

because, as far as he knew, he was the only Nuwaubian in the custody of the MDOC.  (Am. Compl., ECF No. 12, PageID.55.)

Plaintiff was then transferred to MBP where he again commenced his quest for recognition.   Plaintiff first wrote to the MBP chaplain asking for help in acquiring religious texts and recording his Nuwaubian religion on his file.   Chaplain Frisk's response provided Plaintiff a copy of the religious vendor list so Plaintiff could obtain religious texts and informed Plaintiff that his religious preference was at that time recorded as "No preference."   (9/3/2014 Mem., ECF No. 12, PageID.162.)   Accordingly, Petitioner asked for the form to change his preference to Nuwaubu.  By correspondence to MBP Warden Napel, he again sought MDOC recognition of that religion.  (4/9/2015 Corresp., ECF No. 12-1, PageID.167-173.)

A month later, after Plaintiff was transferred to URF, he sent a similar letter to URF Warden Woods.   (5/2/2015 Corresp., ECF No. 12-1, PageID.174-179.)   Two months thereafter, after Plaintiff was transferred to LMF, he sent a similar letter to LMF Warden Bauman. (7/10/2015 Corresp., ECF No. 12-1, PageID.186-191.)   Six months later, after Plaintiff was transferred to AMF, he sent a similar letter to AMF Warden Place.   (1/24/2016 Corresp., ECF No. 12-1, PageID.194-200.)

While Plaintiff was at AMF, he again requested the religious diet and primary religious materials.   (Prisoner kite, ECF No. 12-1, PageID.201.)   On March 10, 2016, Chaplain Snyder informed Plaintiff that he was approved for the religious meal program.   (3/10/2016 Mem., ECF No. 12-1, PageID.203.)   Because Nuwaubu was not recognized, however, Chaplain Snyder also informed Plaintiff that PBF funds were not available to buy materials.   (*Id.*) Chaplain Snyder also noted that it did not appear there were approved vendors that carried

Nuwaubu materials.   (*Id*.)

Plaintiff contends these Defendants have violated his First Amendment free exercise rights, his Fourteenth Amendment equal protection rights, and his right under 42 U.S.C. § 2000cc-1[6] to be free from substantial burdens on the free exercise of his religion absent compelling governmental interest.   Plaintiff seeks a declaration that Defendants have so violated his rights, an injunction compelling Defendants to formally recognize his religion, and compensatory and punitive damages.   (Am. Compl., PageID.65-68.)   On screening, the Court dismissed the bulk of Plaintiff's claims.   At this juncture, the only claims remaining are those asserted against Defendants Finco, Leach, and the unidentified members of the CAC.   Defendants Finco and Leach now move for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case."   *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).   Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial."   *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

---

[6] The statutory section is part of the Religious Land Use and Institutionalized Persons Act of 2000 (herein "RLUIPA").

While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact

could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).   The Sixth Circuit has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

**I.        First Amendment**

Plaintiff's remaining claims allege that Defendants Leach and Finco violated his First Amendment right to freely practice his religion in three ways: (1) denial of his request to participate in the vegan religious diet;[7]  (2) denial of his request to participate in the Ramadan fast; and (3) denial of his request to formally recognize his religion.

As the Supreme Court has observed, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also, Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Thus, while "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates nevertheless retain the First Amendment protection to freely exercise their religion.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987).

---

[7] Plaintiff's request was subsequently granted and Plaintiff has been participating in the vegan diet since 2016. (ECF No. 48-2 at PageID.373).

To demonstrate that his right to freely practice his religion has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) his belief is sincerely held, and (3) Defendant's behavior infringes upon his practice or belief.  *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same).  Even if Plaintiff makes this showing, such does not end the analysis because the fact that "prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Wolfish*, 441 U.S. at 545; *see also, Arauz v. Bell*, 307 Fed. Appx. 923, 928 (6th Cir., Jan. 22, 2009) (even if a prisoner demonstrates a violation of his First Amendment rights, the defendant is entitled to relief if his action is reasonably related to legitimate penological interests).

Operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.  Accordingly, courts have consistently held that issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Wolfish*, 441 U.S. at 547); *see also*, *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (issues involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be accorded deference).

When reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights.  *See Turner*,

482 U.S. at 85.   The standard by which this balancing occurs was articulated by the *Turner* Court, which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."   *Id.* at 89.   This standard represents a "reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."   *Flagner*, 241 F.3d at 481 (quoting *Shabazz*, 482 U.S. at 349).   The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

> 1.   there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2.   whether there are alternative means of exercising the right that remain open to prison inmates;
>
> 3.   the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> 4.   whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Turner*, 482 U.S. at 89-91.

Failure to satisfy the first factor renders the regulation unconstitutional, without regard to the remaining three factors.   If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest.   It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."

Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate penological interest.   *Flagner*, 241 F.3d at 484.

With respect to which party bears the burden concerning the *Turner* analysis, the Supreme Court has held that "[t]he burden. . .is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."   *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This statement clearly places on the prisoner the burden as to the last three *Turner* factors, but says nothing as to which party bears the burden as to the initial factor.   As subsequent courts have concluded, the burden to articulate the rationale for a challenged action must rest with prison officials.   As the Sixth Circuit observed:

> We note that while the burden is on the prisoner to disprove the validity of the regulation at issue. . .Defendants must still articulate their interest in the regulation. . .Otherwise, a prisoner would be forced to hypothesize any number of potential legitimate penological interests and then disprove a reasonable relationship between each and the regulation at issue.

*Figel v. Overton*, 121 Fed. Appx. 642, 646 n.2 (6th Cir., Feb. 4, 2005) (internal citations omitted); *see also*, *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) ("the prison has the burden of demonstrating the First *Turner* Factor").   The Court concludes, therefore, that with respect to the *Turner* factors, Defendants bear the initial burden to articulate a valid, rational connection between the challenged action and the legitimate governmental interest which motivated such.   This burden is "slight, and in certain instances, the connection may be a matter of common sense."   *Johnson*, 669 F.3d at 156.

A.      Denial of Vegan Diet

In his deposition, Plaintiff testified that his religion requires him to adhere to a "healthy diet."   (ECF No. 48-2 at PageID.369-70).   Plaintiff indicated that he subjectively

defined a "healthy diet" as one with no animal products, additives, preservatives, or "stuff like that that might affect one's body." (ECF No. 48-2 at PageID.369-70). However, Plaintiff also testified that his religion did not mandate this particular interpretation of a "healthy diet" and that such was merely his personal preference. (ECF No. 48-2 at PageID.369-70).

To establish that the denial of the vegan diet infringed upon his religious beliefs, Plaintiff must demonstrate that such imposed a "substantial burden on the observation of a central religious belief or practice." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). The substantial burden is high and is satisfied only where such renders religious exercise "effectively impracticable." *Townsend v. Ouellette*, 2018 WL 286427 at *9 (W.D. Mich., Jan. 4, 2018) (citations omitted). A burden is less than substantial if it simply imposes an "inconvenience" on religious exercise or does not compel the individual to "violate his or her religious beliefs." *Ibid.* (citations omitted).

Plaintiff's testimony reveals that failure to adhere to a vegan diet did not violate the tenets of his religion. Thus, the decision to deny Plaintiff's request to participate in the vegan meal program did not constitute a substantial burden to Plaintiff's ability to exercise his religion. Accordingly, with respect to this particular claim, the undersigned recommends that Defendants' motion for summary judgment be granted.

B.      Denial to Participate in Ramadan Fast

In his request to participate in Ramadan, Plaintiff failed to articulate or describe how participation in Ramadan was necessary to the practice of his religion. (ECF No. 48-7 at PageID.398-408). Rather, Plaintiff merely stated that he desired to participate in Ramadan. (ECF No. 48-7 at PageID.398-408). In response to the present motion, Plaintiff has still failed to

establish that participation in Ramadan is necessary to the practice of his religion. Instead, Plaintiff merely states that "If I am not mistaken, I believe Nuwaubians practice Ramadan in the same manner as Muslims." (ECF No. 51 at PageID.430).

In sum, the evidence reveals that Plaintiff's desire to participate in Ramadan is little more than a personal preference the denial of which falls far short of constituting a substantial burden to his ability to practice his religion. Accordingly, with respect to this particular claim, the undersigned recommends that Defendants' motion for summary judgment be granted.

### C.      Refusal to Recognize Plaintiff's Religion

At his deposition, Plaintiff testified that he wanted the MDOC to formally recognize his religion because "it would help establish a meaningful connection with Nuwaubu, the energy, the way of life, and help with my spiritual development in exercising my belief because as it stands now I'm just completely cut off." (ECF No. 48-2 at PageID.372). As the Court previously observed, Plaintiff "does not identify any religious property he was denied and he specifically disclaims any desire for group religious services." (ECF No. 41 at PageID.322). In sum, Plaintiff has failed to demonstrate the refusal by the MDOC to formally recognize his religion substantially burdens his ability to practice such. Accordingly, with respect to this particular claim, the undersigned recommends that Defendants' motion for summary judgment be granted.

## II.      RLUIPA

Plaintiff alleges that Defendants Leach and Finco violated his rights under RLUIPA in three ways: (1) denial of his request to participate in the vegan religious diet; (2) denial of his request to participate in the Ramadan fast; and (3) denial of his request to formally recognize his religion.

RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest.   42 U.S.C. § 2000cc-1(a).   RLUIPA does not define the phrase "substantial burden."   Nonetheless, to come within the scope of RLUIPA the burden in question must render religious exercise "effectively impracticable."   *Marshall v. Frank*, 2007 WL 1556872 at *5 (W.D. Wis., May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)); *see also*, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).   Moreover, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise."   *See, e.g.,* *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1323 (11th Cir. 2005).

For the same reasons discussed above, the Court finds that Defendants' actions did not impose a substantial burden on Plaintiff's ability to practice his religion.   Accordingly, the Undersigned recommends that Defendants are entitled to summary judgment as to Plaintiff's RLUIPA claims.

## III.        Equal Protection

Finally, Plaintiff alleges that Defendants violated his right to the equal protection of the law.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.   To establish an equal protection claim, Plaintiff must establish "that the government treated [him] disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a

suspect class, or has no rational basis." *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). Plaintiff has failed to present evidence that would entitle him to relief on this claim. Accordingly, the undersigned recommends that Defendants are entitled to summary judgment as to this claim.

## IV.        Unserved Defendants

Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served with a copy of the complaint." The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant within 90 days after the filing of the complaint, "the court - on motion or on its own initiative after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *See also*, *Abel v. Harp*, 122 Fed. Appx. 248, 250 (6th Cir., Feb. 16, 2005) ("[a]bsent a showing of good cause to justify a failure to effect timely service, the Federal Rules of Civil Procedure *compel* dismissal") (emphasis added).

The Court ordered service on the unidentified members of the CAC on May 22, 2018. Almost one year has passed and these individuals have not been identified so that service can be attempted. Likewise, Plaintiff has not moved the Court for an extension of time to effect service on these individuals. Considering Plaintiff's lack of diligence, the undersigned recommends that Plaintiff's claims against the unidentified parties named in his amended complaint be dismissed without prejudice for failure to timely effect service.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned recommends that <u>Defendants' Motion for Summary Judgment</u>, (ECF No. 47), be **granted**; Plaintiff's claims against the

unidentified parties in his amended complaint be **dismissed without prejudice**, and this matter

**terminated**.   The undersigned further recommends that appeal of this matter would not be taken

in good faith.   *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. §

1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within fourteen (14) days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).

Failure to file objections within the specified time waives the right to appeal the District Court's

order.   *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th

Cir.1981).

Respectfully submitted,


Dated: May 13, 2019                                  /s/ Ellen S. Carmody
                                                     ELLEN S. CARMODY
                                                     U.S. Magistrate Judge